CLERK'S OFFICE
U.S. DISTRICT COURT
AT ROANOKE, VA
FILED
April 29, 2025
LAURA A. AUSTIN, CLERK
BY: s/ M.Poff, Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | |
|---|---|
| ROSA C. TIPOLD, | ) |
| Plaintiff, | ) Case No. 4:24-cv-00022 |
| v. | ) **MEMORANDUM OPINION** |
| TONY WAYNE ROSS and STEPHANIE DOWDY ROSS. | ) By: Hon. Thomas T. Cullen United States District Judge |
| Defendants. | ) |

Plaintiff Rosa Tipold ("Plaintiff" or "Ms. Tipold") sued Tony and Stephanie Ross ("Defendants" or "the Rosses") after the Rosses' German Shepherd, Mack, bit—and seriously injured—her left hand and wrist on April 30, 2022, while Ms. Tipold was shopping at a Rural King store in Henry County, Virginia. At the time Mack bit her, Ms. Tipold was sitting in a wheelchair that her daughter was pushing around the store

The Rosses moved for summary judgment, arguing that Plaintiff failed to present any evidence that they were negligent in handling Mack prior to his sudden and unexpected attack on Ms. Tipold. After carefully reviewing the record in the light most favorable to Plaintiff, the court concludes that there are certain facts from which a reasonable jury could infer that Tony Ross failed to exercise reasonable care in handling Mack inside this retail store, and that his negligence was the proximate cause of the bite and Plaintiff's injuries. The court will therefore deny the motion for summary judgment as to Mr. Ross. The court, however, will grant summary judgment to Stephanie Ross, as there is no evidence that she was responsible for controlling Mack prior to the biting incident.

## I.　　BACKGROUND

The following facts are either undisputed or presented in the light most favorable to Ms. Tipold, the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Henry v. Purnell*, 652 F.3d 524, 527 (4th Cir. 2011). They are primarily established through the deposition testimony of Ms. Tipold; her daughter, Brandi Leftwich; the Rosses; and Mack's trainer, Michael Craig. Unfortunately, there is no surveillance video of the biting incident itself or testimony from neutral third parties who witnessed it.

For the most part, the facts are undisputed. At the time of the incident, the Rosses had owned Mack for approximately one year. Mack came to them by way of Michael Craig, a local dog trainer. Although Craig, earlier in his career, trained dogs for "special warfare" and tactical missions conducted by the military and numerous law enforcement agencies, he has devoted the past 20 years to the more benign cause of teaching canines to locate missing persons and work as service animals. (Dep. of Michael J. Craig 8:22–9:1, Dec. 5, 2024 [ECF No. 27-1]; Decl. of Michael Craig ¶ 7, Feb. 13, 2025 [ECF No. 17-3].) Craig testified that he rescued Mack "from a basement" where he had been relegated by his prior owners because he was being abused by their other dog. (Craig Dep. at 12:1–2.) Or, as Craig put it: "[T]he reason that Mack got subjected to the basement is the Cane Corse was beating the crap out of him every single day of his life." (*Id.* at 13:16–18.)

Craig initially hoped to train Mack to locate missing persons—a so-called "trailing dog"—but "it was just not his interest." (*Id.* at 14:7–8.) Despite failing at this, Mack successfully completed obedience training under Craig's tutelage, and he learned to follow basic commands and refrain from, among other things, "jumping on people." (*Id.* at 15:3–10.)

Craig testified that, as part of this obedience training, he took Mack, on two separate occasions, to large retail stores. On each of these trips, Mack was exposed to shoppers pushing carts and, according to Craig, he never responded "negatively" by barking or acting aggressively toward anyone. (*Id.* 15:11–16:5.)

After working with Craig for several months, Mack eventually went to live with the Rosses. Craig knew the Rosses because he regularly shopped at their small general store in North Carolina and had previously trained the Rosses' other German Shepherd, Sadie. Craig testified that he continued to train Mack in the months after the Rosses adopted him. Craig recalled that, during regular visits to their general store, he worked with the Rosses and Mack on obedience and socialization skills while handling Mack on his standard five-and-a-half-foot leash. (*Id.* at 25:14–25.) Tony Ross testified that, as part of this training, Craig imparted the importance of keeping "an eye on [Mack]" and of generally being aware of potential triggers of aggressive behavior in canines—including people. (Dep. of Tony Wayne Ross 14:10–20, Dec. 5, 2024 [ECF No. 27-2].)

Mack was regularly exposed to the Rosses' customers during this intermittent training, but he otherwise spent most of his time in a "fenced[-]off" area behind the front counter when he accompanied his owners to their store. (Craig Dep. 25:8–10; *see also* T. Ross Dep. 8:8–10.) There is no evidence that Mack ever acted aggressively toward, let alone attacked, any of the Rosses' customers—or anyone else—during this period. (*See* Craig Decl. ¶ 9; Decl. of Tony Wayne Ross ¶ 8, Feb. 16, 2025 [ECF No. 17-1].)

On April 30, 2022, the Rosses brought Mack with them to a Rural King store in Henry County, Virginia. Tony Ross testified that this was the first time they had taken Mack to a

retail store (other than their own). (T. Ross Dep. 9:25–10:4.) Because the Rosses had regularly seen other dogs with their owners inside this Rural King, they decided to try it with Mack.

Upon arriving at the store, Tony Ross guided Mack using his five-and-a-half-foot leash attached to a chain collar. (*Id.* at 21:6–11; 22:7–24.) After perusing several aisles without incident, the Rosses eventually made their way to an open area between two sets of aisles near the front of the store, where they stopped to talk to another couple who was admiring their dog. According to Tony Ross, they engaged in conversation with this couple and "were talking back and forth just dog talk . . . for at least 20 minutes." (*Id.* at 10:7–18.)

The Rosses faced the other couple during this lengthy conversation; the other couple had their backs turned to the aisles behind them, meaning the Rosses backs were to the "gap" between the aisles. (*See id.* at 10:7–18.) Meanwhile, Mack dutifully sat between his owners, facing the same direction. Mr. Ross claimed that, throughout the entire conversation, he kept a tight hold of the braided handle of Mack's leash, approximately "five inches or so from his neck." (*Id.* at 21:3–11.) That leash, when operated in this fashion, acted as a "slip collar," so that if Mr. Ross pulled up on the handle, the chain would cinch tightly around Mack's neck. (*See id.* 22:7–12.) Mr. Ross maintained, "I had a hold of him. Always, whenever we stop, [we] make him sit. He always does what we tell him to do." (*Id.* at 11:22–23.)

As the Rosses continued talking, Ms. Tipold and her daughter, Brandi Leftwich, proceeded up an aisle toward the open area where the Rosses, and Mack, had stopped with their backs turned. When Leftwich reached the end of the aisle and started to maneuver her mother's wheelchair to the right, Mack suddenly turned around and lunged at Ms. Tipold, biting her left hand. (*See* Dep. of Rosa Tipold 24:9–26:22, Feb. 3, 2025 [ECF No. 25-4].) As

Mr. Ross described it: "We were talking to these people, and out of nowhere, no kind of alert or anything, [Mack] spun around and grabbed her—grabbed her hand. And he didn't growl, he didn't bark, nothing." (Dep. of T. Ross at 10:21–25.)

At her deposition, Ms. Tipold recalled that, as she and her daughter reached the end of one aisle and began the right turn, Mack "ran out and grabbed" her. (Tipold Dep. at 24:12.) She described Mack as having appeared from "between the man's legs" when he attacked, adding: "I thought he was loose, but they had him on a long leash. That's when he got me." (*Id.* at 26:7–11.) Ms. Tipold estimated that her wheelchair was approximately four feet away from Mack when he engaged. (Id. at 28:15–19.) She specifically denied reaching toward or attempting to touch Mack prior to his attack, asserting that she is wary of German Shepherds. (*Id.* at 31:7–16.)

Leftwich generally corroborated her mother's account of their path of travel, their right turn, and their proximity to Mack and the Rosses when his sudden, and unprovoked, attack occurred. According to Leftwich, Mack was "[j]ust a little ways up. That's when it come after her and drug her out of the wheelchair."[1] (Dep. of Brandi Leftwich 12:7–9, Feb. 3, 2025.)[2]

As a result of the attack, Ms. Tipold suffered a fractured wrist and multiple lacerations to her hand that required sutures to close. She further claims a permanent loss of feeling in her hand where she was bitten.

---

[1] Ms. Tipold likely fell out of her wheelchair because she was caught in a tug-of-war between Tony Ross, who attempted to pull Mack—who still had Ms. Tipold's hand in his mouth—away from the wheelchair, and Brandi Leftwich, who attempted to pull the wheelchair away from the dog.

[2] Ms. Leftwich's deposition was not provided on the docket by either party, but is included as an exhibit to this Memorandum Opinion.

Plaintiff initially filed this negligence action in Henry County Circuit Court, but the parties jointly removed the suit to federal court. [ECF No. 1.] At the close of discovery, the Rosses filed the present motion for summary judgment. [ECF No. 16.] The parties fully briefed the motion and provided the court with the complete record of the evidence developed in discovery, including the transcripts of all depositions taken. The court has carefully reviewed these materials and the written arguments of counsel. This record evidence, when viewed in the light most favorable to Plaintiff, clearly establishes genuine issues of material fact underlying the elements of common-law negligence. Accordingly, the court will deny Defendants' motion as to Tony Ross and submit the issue of his alleged negligence to the jury.[3]

## II. SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(a), the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Glynn v. EDO Corp.*, 710 F.3d 209, 213 (4th Cir. 2013). When making this determination, the court should consider "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . [any] affidavits'" filed by the parties. *Celotex*, 477 U.S. at 322 (quoting former Fed. R. Civ. P. 56(c)). Whether a fact is material depends on the relevant substantive law. *Anderson*, 477 U.S. at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* (citation omitted). The

---

[3] The court will also dispense with oral argument because it would not aid the decisional process.

moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the moving party carries its burden, the nonmoving party must then come forward and establish the specific material facts in dispute to survive summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the nonmoving party. *Glynn*, 710 F.3d at 213 (citing *Bonds v. Leavitt*, 629 F.3d 369, 380 (4th Cir. 2011)). Indeed, "[i]t is an 'axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *McAirlaids, Inc. v. Kimberly-Clark Corp.*, 756 F.3d 307, 310 (4th Cir. 2014) (cleaned up) (quoting *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (per curiam)). Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255. But the nonmoving party must "set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'" *Glynn*, 710 F.3d at 213 (quoting *Anderson*, 477 U.S. at 252). The nonmoving party must show that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. "In other words, to grant summary judgment the [c]ourt must determine that no reasonable jury could find for the nonmoving party on the evidence before it." *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 124 (4th Cir. 1990) (citing *Anderson*, 477 U.S. at 248). Even when facts are not in dispute, the court cannot grant summary judgment unless there is "no genuine issue as to the inferences to be drawn from" those facts. *World-Wide Rights Ltd. P'ship v. Combe, Inc.*, 955 F.2d 242, 244 (4th Cir. 1992).

Even though summary judgment may be an appropriate tool to eliminate trial in some cases, it "must be used carefully so as not . . . to foreclose trial on genuinely disputed facts." *Thompson Everett, Inc. v. Nat'l Cable Adv., LP*, 57 F.3d 1317, 1323 (4th Cir. 1995). "The question at the summary judgment stage is not whether a jury is *sure* to find a verdict for the plaintiff; the question is whether a reasonable jury could rationally so find." *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 334 (4th Cir. 2011) (emphasis in original).

### III. DISCUSSION

Virginia law controls this diversity action. *See Erie R.R. v. Tompkins*, 304 U.S. 64, 78–79 (1938). In Virginia, pet owners are not held strictly liable for injuries caused by their dogs. Rather, standard negligence principles apply, such that an owner must exercise ordinary care to prevent his dog from harming others. *Stout v. Bartholomew*, 544 S.E.2d 653, 658 (Va. 2001). "'Reasonable care' or 'ordinary care' is a relative term, and varies with the nature and character of the situation to which it is applied. The amount or degree of diligence and caution which is necessary to constitute reasonable or ordinary care depends upon the circumstances and the particular surroundings of each specific case." *Perlin v. Chappell*, 96 S.E.2d 805, 808 (Va. 1957) (quoting *Montgomery Ward & Co. v. Young*, 79 S.E.2d 858, 859 (Va. 1954)).

When a dog has previously injured another person (or animal), his owners are deemed to be on notice of the canine's aggressive or violent propensities and are subject to "a heightened standard of care with respect to their dog's actions in the future." *Smith v. Simmons*, 89 Va. Cir. 213, 214 (Cir. Ct. 2014). But absent prior notice of such violent tendencies, a dog owner must only exercise a degree of care that "an ordinarily prudent person would exercise

under the same or similar circumstances to avoid injury to another." *Montgomery Ward & Co.,* 79 S.E.2d at 859.

In support of their motion for summary judgment, Defendants correctly point out that there is no evidence that Mack had ever acted violently or aggressively toward another person prior to the Rural King incident, and thus, that they are not charged with upholding a heightened standard of care toward other patrons of Rural King. Defendants further contend that because it was not reasonably foreseeable that Mack would react aggressively, they exercised a reasonable degree of care in handling their dog on his leash while inside the store.

In making this argument, Defendants imply the requisite standard of care that governed their conduct, *vis-à-vis* Mack, inside this store. Reasonable prudence under these circumstances undoubtedly required Defendants to remain attentive to their surroundings, including to the presence and relative location of other shoppers, and to maintain adequate control of their dog. Indeed, Mr. Ross conceded as much at his own deposition when he cited trainer Michael Craig's admonition about watching for potential triggers of aggressive behavior (*see* T. Ross Dep. 14:14–20), and later, when Mr. Ross described, in some detail, how he kept a tight hold on Mack's leash handle, severely restricting the dog's movements (*id.* at 21:9–11).

But the record, when viewed in the light most favorable to Plaintiff, indicates that Mr. Ross may have failed in his duty to exercise reasonable vigilance and control. The Rosses engaged in conversation with other store patrons for approximately 20 minutes with Mack by their side. Throughout this conversation, Mr. Ross had his back turned to the busy shopping aisles behind him and, by his own admissions, was generally oblivious to the movement of other patrons—i.e., potential triggers of an aggressive reaction by his (or potentially any) dog.

A reasonable jury could conclude from this evidence that Mr. Ross, who elected to bring his dog into a busy retail environment, fell short of his legal duty to keep a watchful eye on his surroundings. (*See, e.g.*, T. Ross Dep. 14:14–16 ("I mean it's like Mike [Craig] said. He told us about, you know, to keep an eye on him, you know, watch their posture.")).

Moreover, Ms. Tipold testified that her wheelchair was approximately four feet away from the Rosses—and Mack—when he attacked her. (*See* Tipold Dep. 28:15–19.) Ms. Tipold's estimate, which is generally corroborated by her daughter, stands in marked contrast to Mr. Ross' testimony about keeping a tight hold on Mack's leash, and a reasonable jury, weighing this conflict and making attendant credibility determinations, could justifiably conclude that Mr. Ross was not holding the leash in the manner he described, and thus, that he failed to maintain proper control of his dog under the circumstances.

At bottom, there is sufficient evidence in the record that precludes this court from determining, as a matter of law, that Tony Ross exercised reasonable care in handling Mack prior to the attack at issue. But since it is undisputed that Mr. Ross, rather than his wife, assumed sole responsibility for controlling Mack inside the store, the court will grant Stephanie Ross's motion and dismiss her from this action.

## IV.    CONCLUSION

For the reasons discussed above, the court will deny Tony Ross's motion for summary judgment but grant Stephanie Ross's motion for summary judgment.

The clerk is directed to forward a copy of this Memorandum Opinion and the accompanying Order to the parties.

**ENTERED** this 29th day of April, 2025.

> */s/ Thomas T. Cullen*
> HON. THOMAS T. CULLEN
> UNITED STATES DISTRICT JUDGE